MICHAEL FAILLACE & ASSOCIATES, P.C.
Michael Faillace [MF-8436]
90 Park Avenue, Suite 1700
New York, New York 10016
(212) 786-7368 (phone)
(212) 786-7369 (fax)
*Attorneys for Plaintiff*

------------------------------------------------------------X

ALLON YOMTOV,

                *Plaintiff*,          **COMPLAINT**

       -against-          **05 CV 4630 (LAP)**

THE PRUDENTIAL INSURANCE        **ECF Case**
COMPANY OF AMERICA,

                *Defendant.*

------------------------------------------------------------X

Plaintiff Allon Yomtov ("Yomtov" or "Plaintiff"), by his attorney, Michael Faillace & Associates, P.C., alleges upon knowledge as to himself and upon information and belief as to all other matters as follows:

### NATURE OF ACTION

1.    This action is brought against The Prudential Insurance Company of America ("Prudential" or "Defendant") to redress the deprivation of rights secured to Plaintiff by the Americans with Disabilities Act of 1991, as amended 42 U.S.C. §§ 12101, *et seq*. ("ADA"), the New York State Executive Law §290 *et seq*. (the "Human Rights Law") and the Administrative Code of the City of New York §8-101 *et seq*. (the "City Law").

### JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. § 1343 and 1331, because the claims arise under the laws of the United States and are

brought to recover damages for deprivation of equal rights. Supplemental jurisdiction over Plaintiff's state and city law claims is conferred by 28 U.S.C. § 1367(a) because they arise from a common nucleus of operative facts with the federal claims and are so related that they form part of the same case or controversy.

3. Venue is proper in this District under 28 U.S.C. §1391(b) and (c) and 42 U.S.C. § 2000e-5(f)(3) because Defendant has offices, conducts business, and can be found in this District, and because the acts and omissions complained of occurred in this district.

4. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and 2202.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

5. On or about May 20, 2004, Yomtov filed a Complaint against Defendant with the New York State Division of Human Rights ("NYSDHR"), which dually filed a charge with the Equal Employment Opportunity Commission ("EEOC") under Federal Charge No: 16GA401917.

6. Yomtov charged Defendant with unlawful discrimination in connection with the terms, conditions, privileges, and termination of his employment because of his disability.

7. On or about November 19, 2004, Plaintiff received notice from the EEOC, informing him of his right to file a civil action.

8. Uchente Emuleomo ("Emuleomo"), Vice President, Corporate Counsel, had knowledge of the facts surrounding Yomtov's complaint. On or about June 25, 2004, Emuleomo submitted a position statement to the NYSDHR on behalf of Prudential Financial, Inc., discussed the merits of the claim with Yomtov's attorneys in July 2004 during settlement discussions, and submitted supplemental information to the NYSDHR on or about August 27, 2004.

9.      On January 24, 2005, Faillace again discussed Yomtov's disability claims with Emuleomo, but the parties were unable to reach a settlement. When Faillace informed Emuleomo that he intended to file a lawsuit in federal court on behalf of Plaintiff, she unequivocally asserted that Prudential would enforce Yomtov's employment agreement, which required him to submit all employment-related disputes and claims to the National Association of Securities Dealers ("NASD"). Emuleomo stated that Yomtov's dispute would have to be tried with the NASD, and that Prudential would file a motion to compel arbitration if Yomtov filed a lawsuit in federal court. Emuleomo gave clear indication that Prudential would consent to arbitration with the NASD and offered to provide the required forms and paperwork.

10.     Section 8 of the Financial Services Associate Agreement between Yomtov and Prudential states:

> "I agree to submit and settle any and all disputes, claims or controversies arising out of or related to my employment with the Company, including but not limited to violations of this Agreement, pursuant to the Constitution and Rules of the National Association of Securities Dealers, Inc. In the event that I violate any part of this section, I agree to pay all attorneys' fees incurred by the Company to enforce its rights hereunder."

11.     Kelvin Yu, a law clerk employed by Faillace, reviewed Prudential's arbitration procedures with Emuleomo, inquiring whether Prudential utilized an internal dispute resolution procedure and whether Prudential covered the NASD filing fees. Emuleomo stated that Yomtov could simply file with the NASD by citing the employment agreement and that a consent to arbitrate form was not required. She confirmed that arbitration with the NASD was the proper forum for Yomtov to litigate his claim, and at no time during the conversation did Emuleomo state or otherwise imply that Prudential would not agree to arbitration.

12.     On or about April 1, 2005, Plaintiff filed a request for arbitration with the NASD.

13. On or about May 9, 2005, Ms. Georgette David, Legal Assistant at the NASD Dispute Resolution, informed Faillace that the NASD would not accept Yomtov's case because the NASD only hears employment discrimination cases on a voluntary basis, and Prudential would not agree to arbitration. Surprised, Faillace immediately called Emuleomo to request an explanation. In their telephone conversation, Emuleomo initially denied consenting to arbitration. When Faillace reminded her of their January 24, 2005 conversation, she admitted that she made statements about compelling arbitration, but claimed that she had been unaware that Yomtov's case involved discrimination at the time she consented to arbitration.

14. Emuleomo's material misrepresentations and affirmative misconduct caused Yomtov to delay the filing of his lawsuit to his detriment.

15. Prior to filing this Complaint, Plaintiff served a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York in accordance with N.Y.C. Admin. Code § 8-502(c).

**PARTIES**

16. Plaintiff Allon Yomtov is an adult male residing in New York County, New York.

17. Prudential is a New Jersey corporation that maintains its headquarters at 751 Broad Street, Newark, New Jersey 07102-3777. Prudential is one of the largest life insurance companies in the United States. Prudential has an office located at 630 Fifth Avenue, New York, New York 10111.

18. Prudential offers a variety of products and services, including life insurance, mutual funds, annuities, pension and retirement related services and administration, asset management, securities brokerage, banking and trust services, real estate brokerage franchises and relocation services.

19. Prudential Financial is a service mark of The Prudential Insurance Company of America and its affiliates.

**FACTUAL ALLEGATIONS**

20. Yomtov is deaf, suffering from a congenital hearing impairment. Yomtov is substantially limited in the major life activities of hearing and interacting with others. Although Yomtov is skilled in lip-reading, it is not possible to lip-read every word or every person, nor is lip-reading effective in situations where multiple people are talking.

21. In February 1998, Yomtov graduated from the Rochester Institute of Technology with a Masters in Business Administration in finance.

22. From 1999 until 2001, Yomtov worked as an Actuarial Associate at Towers Perrin in Boston. Plaintiff's performance in his position, which was fast-paced and required extensive multi-tasking, was at least satisfactory.

23. On September 4, 2001, Yomtov began working for Defendant as an Actuarial Associate in its Newark office. He performed his position successfully.

*Yomtov Requested an Accommodation During His Interview*

24. In June 2003, Prudential interviewed Yomtov for the position of Financial Services Associate (FSA). During the rigorous and thorough three-week interview process Yomtov interviewed with Athan Vorilas, Managing Director, Kwimin Ahn, Manager, Financial Services, and Doug Strugibenneti, Manager, Agency Training.

25. During the interview, Yomtov informed Strugibenetti that he would require an interpreter for all meetings, training sessions, and client contact sessions. Mr. Strugibenetti pressured Yomtov to waive his right to an accommodation.

26. When Yomtov emphatically restated his need for an interpreter, a heated discussion ensued. Yomtov reluctantly bowed to their pressure and finally agreed that lip-reading would be sufficient and he would not need an interpreter for client contact sessions, because the meetings would generally be one-on-one and he could generally control the conversation.

27. However, Yomtov stood firm on his need for an interpreter for training sessions and meetings, and Strugibenetti informed Plaintiff that he would look into the matter at a later date.

28. During the interview, Ahn characterized the vacation policy as flexible and easy. Ahn told Yomtov that each FSA could set his own vacation schedule and work as many or as few hours as it took to be successful. Ahn explained that one associate who had worked quite hard was able to take two months vacation.

29. Yomtov stated that he wanted to start the FSA position in August 2003, but Ahn insisted that he begin on July 14, 2003. As a compromise, Ahn agreed to give him two weeks off during September or October 2003 due to the earlier start date.

30. As an FSA, Yomtov worked at the Prudential office located at 630 Fifth Avenue, New York, New York 10111.

31. During the interview, Prudential neglected to inform Yomtov that FSAs would be terminated for failing to meet quota requirements.

32. Yomtov satisfied all the pre-requisites for the FSA position.

33. Yomtov was qualified for the FSA position, passing the numerous required exams and obtaining the necessary licenses for the position.

34. Prudential provides an internal two-year training program for FSAs to prepare them for careers in financial planning. Prudential provided Plaintiff an interpreter for the week-

long training program in September 2003, as well as the mandatory compliance meetings that took place on November 21, 2003 and February 10, 2004.

*Prudential Failed to Accommodate Plaintiff Despite His Repeated Requests*

35.     When Yomtov requested an interpreter during his interview, Strugibenetti informed him that Prudential could not afford the interpreters. Instead, Strugibenetti simply suggested that he "raise his hand" whenever he did not understand something. Yomtov responded that such an accommodation was insufficient because it was impossible to read lips in situations where people spoke simultaneously. Strugibenetti insisted that they would resolve the issue when Yomtov began working.

36.     In August 2003, after the five or six-week self-study period of his job ended, Yomtov again met with Strugibenetti and Ahn to discuss his need for an interpreter or reasonable accommodation. Strugibenetti responded that he had spoken with Amy Bennett in Human Resources, but she had rejected the request for the funds to provide an interpreter.

37.     Yomtov continued to experience extreme difficulties during the training sessions and again discussed the need for an accommodation with Strugibenetti in September 2003. Strugibenetti stated that hiring an interpreter for even one day per week was not within Prudential's budget.

38.     In October 2003, Yomtov also discussed various accommodations with Gail Crawford and Sally Cohen.

39.     Frustrated with the lack of cooperation from his managers, Yomtov contacted Karen Mollach-Brown in Human Resources at company headquarters on or about the first week of October 2003. Yomtov informed her that his managers refused to provide interpreters for his

training sessions and meetings, and Ms. Mollach-Brown referred him to Ignace Conic, Vice-President Diversity.

40. In response, Strugibenetti provided Yomtov a Job/Worksite Accommodation Request Form, which he completed and submitted on October 30, 2003. Section IV of the form was completed by Dr. Ellen Pfeffer Lafargue. Dr. Lafargue is certified by the American Speech and Hearing Association, is a member of the American Academy of Audiology, and is licensed by the states of New York and New Jersey. Dr. Lafargue specifically wrote that Plaintiff "requires services of a sign language interpreter in training sessions and meetings if he is to be able to understand content, learn, participate. Real time captioning is the only other alternative."

41. On November 10, 2003, Yomtov discussed his need for a work-related accommodation with Sue Meadows, an associate at the Health and Wellness Accommodation Unit. Meadows repeatedly insisted that Yomtov had the same knowledge base as non-disabled FSAs and refused to accept that he needed an interpreter. After a heated discussion, Yomtov informed her that he intended to hire a lawyer to resolve the situation. After the meeting with Meadows, Strugibenetti informed Yomtov that the Office of Vocational and Education Services for Individuals with Disabilities (VESID) would provide an interpreter for him.

42. Prior to January 2004, Defendant failed to provide interpreters for the numerous other training sessions and meetings. These included Vorilas's one-hour weekly presentation, daily team whiteboard meetings, and the five-hour training sessions that were given every Monday.

43. In these fifteen to twenty person training sessions, FSAs and managers shared their ideas, experiences, as well as frustrations. In addition, instructors reviewed essential sales techniques, mistakes commonly made by new associates, and strategies for handling a wide

range of clientele. These meetings not only provided FSAs a solid foundation upon which to build careers in financial planning, but also directly assisted FSAs in obtaining sales to meet their quotas.

*Accommodations Finally Provided by Defendant Were Insufficient*

44.     Although VESID provided an interpreter beginning in January 2004, the interpreter was only available for Monday training classes and two hours of whiteboard meetings. Notably, the interpreter was not present to assist Yomtov during the weekly unit meetings, weekly presentations, nor several other last minute meetings and training sessions.

45.     Prudential also failed to provide Yomtov numerous technological accommodation requests, such as:

   a. online chat software, a free and very important sales and communication tool for the deaf community;

   b. Video Relay Service, a free service provided by Sprint that facilitates communication for deaf and hearing-impaired individuals that is much faster and efficient than a text telephone (through a web camera, the deaf individual communicates via sign language to an operator, who can then relay the conversation to the other party);

   c. Internet access to web sites such as the Metropolitan Transportation Authority and New Jersey Transit to allow Yomtov to access updated train and bus schedules for customer meetings;

*Prudential's Failure to Accommodate Yomtov's Disability
Prevented him from Meeting his Quota Requirements*

46.     Yomtov's production period began on September 29, 2003.

47. Prudential evaluated FSAs on their ability to meet certain sales requirements and evaluated them against quarterly (thirteen-week) quotas.

48. The week of September 22, 2003, Prudential instructed FSAs to call prospects and schedule between twenty to fifty appointments for the first two weeks of their production periods. However, Prudential failed to provide Yomtov a means to place telephone calls. Yomtov brought his TTY (a special text telephone device that allowed him to type messages back and forth instead of talking and listening), but the Connecticut office where they were located utilized a digital phone system which rendered the analog TTY telephone useless. As a result, Yomtov started the production period behind other FSAs.

49. As of November 2003, Prudential was still in the "beginning stages of evaluating" Yomtov's request for accommodation, and Prudential did not provide an interpreter during this quarter despite Yomtov's repeated requests.

50. Absent the required accommodations, Yomtov produced $1,981 against a target of $9,000 in Gross Distribution Revenue (GDR) credits during his first validation quarter, which ended approximately December 19, 2003.

51. In January 2004, when VESID began providing an interpreter for some of the meetings and training sessions, Yomtov demonstrated immediate improvement in his job performance. In fact, Prudential awarded Yomtov the Fast Start Award in February 2004 based on his recent sales.

52. During his second validation quarter, Yomtov produced $11,976 in GDR credits—more than a 600% increase over his first quarter production.

53. Under Prudential's policies, validation points are cumulative targets. As a result, Yomtov's ability to meet the second quarter validation point of $21,250 GDR was severely

affected by his performance during the many weeks when Prudential did not accommodate his disability.

54. On or about March 12, 2004, Yomtov informed Ahn and Strugibenetti that he would likely fall short of the cumulative second quarter quota due to the lack of accommodations. Ahn and Strugibenetti clearly stated that he would nevertheless be terminated if he failed to validate on March 19, 2004.

55. Prudential terminated Yomtov on April 2, 2004.

*Prudential Discriminated Against Yomtov Due to his Disability*

56. Prudential failed to provide Yomtov the same training as non-disabled FSAs.

57. Prior to having an interpreter, Yomtov was forced to raise his hand during meetings when he did not understand something. However, the instructors failed to explain the material thoroughly, often summarizing several minutes of discussion into a few short sentences. On other occasions, instructors would simply tell Yomtov that the information he missed was not important and thus not worth repeating.

58. Yomtov missed many training sessions because they were announced at meetings where he did not have an interpreter. Prudential also failed to provide translations of training materials that were distributed in audio format that were given to FSAs.

59. The various meetings served to forge a sense of camaraderie and instill a sense of teamwork. However, Prudential excluded and isolated Yomtov from the rest of the FSA training class. As a result, Yomtov felt frustrated, as the lack of accommodation prevented him from participating, sharing, laughing, and learning from the other FSAs.

60. Yomtov's managers informed him that he was responsible for managing his own schedule, and that he should do whatever it took to be successful. Because he was unable to

understand much of the group discussions without an interpreter, and often observed that many other FSAs freely arrived late and left early, Yomtov believed that the meetings were optional. One day, immediately after Yomtov left a whiteboard meeting early, Strugibenetti yelled at him for leaving without informing him. However, Strugibenetti allowed other FSAs to walk in and out of meetings without obtaining permission.

61.     Ahn and Strugibenetti provided Yomtov much less feedback and guidance than other FSAs. Although Prudential was supposed to provide Yomtov a weekly performance review, neither Ahn nor Strugibenetti performed these reviews on a regular basis. In fact, Yomtov was only given two weekly reviews during his employment. In addition, Ahn and Strugibenetti rarely gave Yomtov feedback after client meetings.

62.     Ahn's failure to provide Yomtov the minimal level of guidance provided to other FSAs interfered with his ability to achieve his quotas. For example, Ahn was aware that Yomtov was not licensed in New Jersey, but nevertheless allowed him to make sales appointments in that state. Not surprisingly, Prudential's compliance officer forced Yomtov to cancel all his New Jersey sales appointments.

63.     Ahn constantly bullied Yomtov for his poor performance.

64.     Prudential failed to respond in a timely fashion to Yomtov's requests to publish an advertisement in deaf publications for a public seminar he intended to host as a means of developing sales. Prudential's policies required Yomtov to secure approval for any advertisement from the Marketing Materials Mall, and due to its delay, Yomtov was unable to develop sales from his public seminar to apply towards his quota.

65.     Prudential introduced a system where FSAs would share and exchange sales leads in an effort to generate additional sales. However, other FSAs failed to share their leads with

Yomtov because of his deafness. When Yomtov informed Ahn about the treatment, he told Yomtov to work alone.

66. Under Prudential's evaluation system, Ahn was rewarded for the total amount of sales generated by the FSA training class. As a result, Ahn provided Yomtov limited guidance and training once he realized that Yomtov had missed a considerable amount of information that was provided during training sessions.

67. Unlike other FSAs, Prudential misled Yomtov about the vacation policy. Although Prudential's termination letter claimed that FSAs were not entitled to vacation during their training period, Ahn, Strugibenetti, and Vorilas agreed to provide Yomtov one week of vacation due the circumstances surrounding his early start date. Additionally, Vorilas agreed that Yomtov could take a vacation in March 2004. Despite knowledge that Yomtov desired to take vacation that allegedly violated its policies, Prudential neglected to inform Yomtov of any potential consequences. Instead, Prudential allowed Yomtov to take his vacation and advised him that he could apply for FMLA leave upon his return.

*Interference, Retaliation, Coercion*

68. Prudential repeatedly pressured Yomtov to forego his request for accommodations. Due to Prudential's coercion and tacit threats during the interview, Yomtov was forced to agree to address the need for an interpreter at a later date. As a result, Yomtov was left without an interpreter for the entirety of his first validation quarter.

69. After Yomtov was provided an interpreter on a limited basis, Prudential took an adverse action against him by subjecting him to greater scrutiny. For instance, Ahn warned Yomtov that he was expected to generate more sales, and that headquarters would be carefully

watching his performance. In addition, Ahn required Yomtov to enter all of his appointments in the computer system so that Ahn could closely monitor him.

70.     Ahn and Strugibenetti threatened to terminate Yomtov if he did not show an immediate improvement in January 2004, since they claimed that he had been accommodated.

## FIRST CAUSE OF ACTION
### Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

71.     Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

72.     Defendant intentionally discriminated against Plaintiff on account of his disability in violation of the ADA by subjecting him to disparate treatment on account of his disability by denying him the more favorable training, compensation, terms, conditions, and privileges of employment enjoyed by similarly situated employees who are not disabled.

73.     Defendant intentionally denied Plaintiff a reasonable accommodation for his disability in violation of the ADA, thus denying to him the equal terms and conditions of employment. The unlawful employment practices complained of were done with malice or reckless indifference to Plaintiff's federally protected rights.

74.     Defendant coerced, intimidated, threatened, and interfered with Plaintiff's attempts to request an accommodation. Defendant also retaliated against Plaintiff for his repeated requests for accommodation.

75.     As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered substantial losses, including loss of past and future earnings and other company-sponsored benefits.

76.     As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other

reemployment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress, and humiliation.

77. Plaintiff has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### New York State Executive Law, 15 N.Y. Exec. Law §§ 291 *et seq.*

78. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

79. Defendant is an employer within the meaning of the New York State Human Rights Law.

80. In violation of the New York State Human Rights Law, Defendant failed to accommodate Plaintiff's disability, intentionally discriminated and retaliated against Plaintiff by subjecting him to disparate treatment on account of his disability by denying him the more favorable compensation, terms, conditions, and privileges of employment enjoyed by similarly situated employees who are not disabled.

81. The acts and omissions alleged herein were reckless, malicious, and made with callous disregard and deliberate indifference to Plaintiff's rights.

82. As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other reemployment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress, and humiliation.

83. Plaintiff has been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### The New York City Human Rights Law

84. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

85. Defendant is an employer within the meaning of the New York City Human Rights Law.

86. In violation of the New York City Human Rights Law, Defendant failed to accommodate Plaintiff's disability, intentionally discriminated and retaliated against Plaintiff by subjecting him to disparate treatment on account of his disability and by denying him the more favorable compensation, terms, conditions, and privileges of employment enjoyed by similarly situated employees who are not disabled.

87. As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other reemployment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress, and humiliation.

88. Plaintiff has been damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and to provide the following relief:

(a) Directing such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue;

(b) Making Plaintiff whole for all earnings he would have received but for Defendant's discriminatory and unlawful treatment, including, but not limited to, wages, health insurance and other fringe benefits, bonuses, pension, back pay, front pay, and other lost employment benefits;

(c) Awarding Plaintiff compensatory damages in an amount to be proven at trial;

(d)  Awarding Plaintiff punitive damages in an amount sufficient to punish and deter Defendant;

(e)  Awarding Plaintiff the expenses incurred in this action, including costs and attorneys' fees;

(f)  Awarding Plaintiff prejudgment interest; and

(g)  Entering such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all claims so triable.

Dated:  New York, New York
        May 10, 2005

MICHAEL FAILLACE & ASSOCIATES, P.C.

By: _____
    Michael Faillace [MF-8436]
    90 Park Avenue, Suite 1700
    New York, New York 10016
    (212) 786-7368 (phone)
    (212) 786-7369 (fax)
    *Attorneys for Plaintiff*